## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| COMTEL TECHNOLOGIES INC., ) | |
| SOLAI & CAMERON INC., and ) | |
| MALLAR R. SOLAI individually, ) | |
| ) | |
| Plaintiffs/Counter-Defendants, ) | |
| ) | |
| vs. ) | No. 04 C 3879 |
| ) | |
| PAUL H. SCHWENDENER, INC. and ) | |
| NULINE TECHNOLOGIES INC., ) | |
| ) | |
| Defendants/Counter-Plaintiffs. ) | |
| ----- | |
| PAUL H. SCHWENDENER, INC., ) | |
| ) | |
| Third Party Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| HARTFORD FIRE INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Third Party Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Comtel Technologies, Inc. (Comtel), Solai & Cameron, Inc. (S&C) and Mallar Solai (Solai) brought this action against Paul H. Schwendener, Inc. (PHS) and Nuline Technologies, Inc. (Nuline) alleging violation of federal civil rights statutes, 42 U.S.C. §§ 1981, 1982, and 1985(c), as well as various state law claims. In turn, defendant PHS filed a 24-count counterclaim against Comtel, S&C and Hartford Fire Insurance Co. (Hartford) for breach of contract, unjust enrichment, contract reformation and performance on various bonds. Both PHS and Nuline have filed motions to dismiss various counts of plaintiffs' complaint, and Comtel, S&C, and Hartford have moved to dismiss or, in the alternative, stay counter-plaintiff

PHS' action. PHS' and Nuline's motions to dismiss are granted in part and denied in part. Comtel's and S&C's motion to dismiss or stay PHS' counterclaims is denied, as is Hardford's motion.

## BACKGROUND

The following facts, taken from plaintiffs' amended complaint (complaint), are, for purposes of this motion, accepted as true. Mallar Solai, an Indian immigrant, arrived in the United States 24 years ago. She now owns two corporations: Comtel, dedicated to electrical contracting, and S&C, dedicated to computer systems integration. In the spring of 2001, Comtel submitted bids to PHS, a general contractor, for work as the electrical subcontractor on two projects for the Plainfield Community Consolidated School District. Comtel bid $1,425,138 for work on a Plainfield high school and $2,493,991 for work on a middle school. Dave Seger, a PHS project manager, allegedly informed Comtel that another electrical subcontractor had submitted bids of $1,008,160 for the high school project and $1,108,840 for the middle school project, and that Comtel would have to match these bids to receive the contracts. Comtel agreed to the lower payments and contracted with PHS to provide the electrical work for both school projects.

PHS informed Comtel that all subcontractors were required to post performance and payment bonds. Comtel provided these bonds, though they were mistakenly issued in the name of Solai's other company, S&C. Upon receipt of the bonds, PHS altered its contracts with Comtel, replacing "Comtel" with "Solai & Cameron." In response to PHS' demands, S&C assumed Comtel's right to payment for its electrical work and invoiced PHS for Comtel's work.[1] Allegedly, despite PHS' representation regarding the bonds, only Comtel and one other

---

[1] Given these allegations, at this stage, we refer to Comtel and S&C interchangeably.

subcontractor were required to provide the bonds.

Comtel began work in June 2001 with Nick Servedio as its general manager. To help forecast its costs, need for supplies, and employee hours, Comtel requested in late November 2001 that PHS provide a project schedule for both school buildings, but PHS did not respond. Without a schedule, Comtel was forced to speculate when it would be able to do its electrical work. On several occasions PHS scheduled a room's electrical work and painting for the same days. Comtel employees twice sought medical attention due to the inhalation of paint fumes.

In February 2002, Solai became more personally involved in overseeing her company's work on the school projects. On March 20, 2002, PHS sent S&C a three-day "Notice of Termination," complaining that Comtel was not adequately performing its work, employed too few workers, and lacked sufficient materials and equipment. Two days later Servedio met with PHS representatives and assured them that Comtel would make the changes requested by the general contractor in order to remedy its allegedly defective performance. The parties agreed to meet again later in the month and Comtel continued working on the project.

In May 2002, Comtel employees informed Solai that a PHS employee had made racist comments about her. Solai also learned of graffiti in bathroom stalls at the work sites that denigrated Comtel. In a letter, Solai informed PHS of its employee's comments and the bathroom grafitti. Yet, PHS allegedly took no action. In early May 2002, Comtel began working a second shift of electricians who were predominantly African-American. In response, a PHS employee asked Servedio, "Why are you bringing the African National to our project?" A few weeks later Comtel was told it could no longer work the second shift. Solai wrote another letter in early June 2002, complaining of PHS employees mimicking her accent.

In April 2002, PHS hired Nuline to monitor Comtel's electrical work and prepare an

evaluation. Plaintiffs allege that this was part of a PHS scheme to replace Comtel with Nuline, and that, after observing Comtel's work, Nuline submitted its report recommending that Comtel be terminated for non-conforming work. Soon thereafter, Nuline began doing the electrical work on the projects, and allegedly damaged and destroyed wiring and fixtures previously installed by Comtel. PHS also allegedly met with Hartford, the insurance company that provided the bonds for Comtel, to discuss the electrical contractor's performance.

Though PHS issued its last payment to S&C on February 8, 2002, for work performed in December 2001, Comtel continued to perform under its subcontract. By June 2002, it had completed 95% of its work on both school projects. Nonetheless, PHS terminated Comtel and S&C from the middle school project on June 7, 2002, and from the high school project on June 15, 2002. Plaintiffs maintain that PHS failed to give notice of a specific deficiency before terminating Comtel, as required under Section 2c of the subcontract. After terminating Comtel, PHS claimed back-charges against S&C and Comtel, and filed payment applications with the school district, which failed to reflect plaintiffs' labor and material costs. In its June payment application, PHS allegedly sought payment for electrical work it had not performed. Based on PHS' representations, the school district paid the contractor for the work.

This is not the first case to arise out of this soured business relationship. On July 16, 2002, S&C and Comtel filed two complaints in state court against PHS for its unlawful termination. These cases were consolidated and are pending along with PHS' counterclaim. A suit filed by Nuline against PHS was also consolidated with those actions. Plaintiffs filed this ten-count amended complaint against PHS and Nuline in federal court on June 16, 2004.

## DISCUSSION

### PHS' and Nuline's Motions to Dismiss

A Federal Rule of Civil Procedure 12(b)(6) motion to dismiss tests the sufficiency of the complaint, not the merits of the case. Triad Assocs., Inc. v. Chicago Hous. Auth., 892 F.2d 583, 586 (7th Cir. 1989). In deciding a motion to dismiss, the court must assume the truth of all well-pleaded allegations, making all inferences in the plaintiff's favor. Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund, 25 F.3d 417, 420 (7th Cir. 1994). The court should dismiss a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). PHS and Nuline filed separate motions to dismiss. However, we will address the motions together as several counts were brought against both defendants and several arguments overlap. First, we consider Mallar Solai's standing to bring any claims in this case.

### Mallar Solai

In its motion, PHS argues that plaintiff Mallar Solai lacks standing to bring any of the alleged counts because she has not suffered an "injury in fact." The Seventh Circuit has held as a general principle that a corporate shareholder "does not have an individual right of action against third parties for damages to the shareholder resulting indirectly from injury to the corporation." Flynn v. Merrick, 881 F.2d 446, 449 (7th Cir. 1989)(citing Twohy v. First National Bank of Chicago, 758 F.2d 1185, 1194 (7th Cir. 1985)). In other words, Solai does not have standing for claims of the corporation simply because of her status as the sole shareholder. In their response to defendant's motion, plaintiffs argue that Solai has standing under the civil rights statutes because she was targeted with racist comments, graffiti and mimickery, which damaged her reputation and caused her embarrassment and humiliation.

Yet, Solai's allegation of personal injury does not support her standing under plaintiffs' 42 U.S.C. §§ 1981, 1982, and 1985 civil rights claims.

Section 1981 guarantees all persons several rights, including the right to make and enforce contracts, regardless of race. "To establish a claim under § 1981, [plaintiffs] must show that (1) they are members of a racial minority; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract)." Morris v. Office Max, Inc., 89 F.3d 411, 413 (7th Cir. 1996). Lacking precedent from the Seventh Circuit, district courts in the Northern District of Illinois have followed those circuits that have held that a shareholder cannot bring a § 1981 claim for discrimination where it was the corporation that sought to make or enforce a contract. See Perez v. Abbot Laboratories, 1995 WL 86716 at *5 (N.D.Ill. 1995)(citing Gersman v. Group Health Association, Inc., 931 F.2d 1565, 1569 (D.C. Cir 1991); Searcy v. Houston Lighting & Power Co., 907 F.2d 562, 565 (5th Cir.) cert. denied, 498 U.S. 970 (1990); Des Vergnes v. Seekonk Water Dist., 601 F.2d 9, 16 (1st Cir. 1979); see also Cooper v. Durham School Services, 2003 WL 22232833 at *2 (N.D.Ill. 2003); but see Great American Tool and Manufacturing Co. v. Adolph Coors Co., 780 F.Supp. 1354 (D.Colo. 1992); Rosales v. At&T Information Systems, Inc., 702 F.Supp. 1489 (D.Colo. 1988). As the First Circuit has explained, "Nothing in section 1981 provides a personal claim, so far as its language is concerned, to one who is merely *affiliated* – as an owner or employee – with a contracting party that is discriminated against by the company that made the contract." Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 14 (1st Cir. 1999)(finding that the owner of an independent contractor did not have a § 1981 claim against Wal-Mart, despite hostile racial incidents, because he did not have a contract with Wal-Mart – his company did). Solai does

not allege that she was party to any contract with defendants, therefore she has no individual claim under § 1981, nor can she assert one as the sole shareholder of Comtel and S&C.

Solai lacks standing to assert § 1982 and § 1985 claims as well. Section 1982 guarantees all citizens the same right to inherit, purchase, lease, sell, hold and convey property as is enjoyed by white citizens. 42 U.S.C. § 1982. In their § 1982 claim, plaintiffs allege that defendants deprived them of these rights by interfering with their contracts and destroying their property. Solai was not party to any alleged contracts, nor did she own any of the property allegedly destroyed, and therefore she has no standing. Likewise, Solai does not have standing to bring a claim under 42 U.S.C. § 1985. Section 1985 provides a cause of action for injury resulting from a conspiracy to deprive an individual of equal protection of the law. Plaintiffs allege that defendants engaged in such a conspiracy to deprive them of their rights, "specifically, the right to make and enforce contracts and convey property." Once again, these are not allegations that apply to Solai.

Plaintiffs cite <u>Chicago Miracle Temple Church, Inc. v. Fox</u>, 1994 WL 176189 (N.D.Ill. 1994) in support of their argument that Solai has standing to sue. In <u>Fox</u>, an African-American church, its pastor and several members of the congregation brought suit against the Village of Lansing, its mayor, and its board of trustees, for conspiring to prohibit the church from purchasing a building because of its congregants' race. The plaintiffs alleged claims under 42 U.S.C. §§ 1983, 1985 and 1986, and the defendants argued that the individual plaintiffs lacked standing to sue. The court found that "although individual plaintiffs would lack standing to assert a claim for interference with the right to contract, they do not lack standing to assert equal protection claims." *Id.* at *2. Since the complaint alleged violation of civil rights and resultant damages, individual congregants had standing to assert claims

against the state actors. Unlike the plaintiffs in <u>Fox</u>, Comtel, S&C and Solai do not allege an

equal protection violation against a state actor, nor do they bring a claim under § 1983. Just

as the plaintiffs in <u>Fox</u> would have lacked standing to bring a § 1981 claim, so too does Solai.

*See id.; see also* <u>New Christian Valley M.B. Church v. Board of Education of School Dist. #149</u>,

704 F.Supp. 868, 870 (N.D.Ill. 1989)(dismissing individual plaintiffs' § 1982 claims where they

failed to allege that they attempted to lease and hold real property, but were impeded by

defendants).

In their response to the motion to dismiss, plaintiffs do not contend that Solai has

standing to assert the various state law claims: fraud, violation of the Illinois Uniform

Deceptive Trade Practices Act, conversion, tortious interference with business relationship and

civil conspiracy. Rightly so, as these counts concern only allegations involving dealings

between Comtel, S&C and defendants. All claims are dismissed to the extent they are brought

by Mallar Solai. The subsequent analysis will address the claims as brought by Comtel and

S&C.

## 42 U.S.C. § 1982 (Count II)

Next, PHS and Nuline argue that most of plaintiffs' counts should be dismissed

altogether, including count II for violation of § 1982. As explained above, § 1982 provides that

"[a]ll citizens of the United States shall have the same right, in every State and Territory, as

is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and

personal property." Plaintiffs allege that defendants destroyed electrical wiring and fixtures

that Comtel had installed, thus depriving plaintiffs of the right to convey personal property

based on race. PHS argues that plaintiffs fail to properly plead this claim and that they lack

standing to sue under this statute. While Count II does not specifically state what property

defendants allegedly destroyed, it incorporates earlier paragraphs stating that defendants destroyed Comtel's electrical work on the Plainfield projects. This sufficiently identifies the property at issue. Nonetheless, there is a more fundamental defect – plaintiffs lack standing to bring the count.

Plaintiffs' § 1982 claim concerns the rights of Comtel and S&C, the alleged owners of the destroyed property. PHS argues that plaintiffs, as corporations, cannot bring a § 1982 claim. PHS does not cite any precedent on point, nor do we find any in the Seventh Circuit. A broader search of case law reveals that while some courts have presumed that corporations can bring § 1982 claims, *see e.g.*, Park View Heights Corp. v. City of Black Jack, 467 F.2d 1208, 1214 (8th Cir. 1972)(allowing corporate plaintiffs standing to bring claims under both § 1981 and § 1982), and some courts have presumed that they cannot, *see e.g.,* American Civil Rights Investigations, Inc. v. O'Connor & Tushla, 1989 U.S.Dist. LEXIS 17771 at *4 (W.D. Mich. 1989)(dismissing plaintiff corporation's § 1982 claim because only citizens have claims under the statute), no court has provided much analysis of the issue. We find that § 1982 on its face precludes a corporation from bringing a claim.

Unlike §§ 1981 and 1983 which apply to "persons", § 1982 protects the property rights of "citizens of the United States." Given this distinction, the court in Vietnamese Fishermen's Association v. Knights of Ku Klux Klan, 518 F.Supp. 993 (S.D.Tex. 1981), held that a plaintiff class of Vietnamese fishermen could bring a § 1981 claim because aliens are persons under the statute, but could not bring a § 1982 claim because the statute only applies to citizens. Like aliens, corporations are "persons" within the meaning of the Fourteenth Amendment, but they are not "citizens". Fulton Market Cold Storage Co. v. Cullerton, 582 F.2d 1071, 1079 (7th Cir. 1978), *cert. denied*, 439 U.S. 1121 (1979)("[A] corporation is a 'person' within the meaning of

the equal protection and due process of law clauses of the Fourteenth Amendment" but "a corporation is not a 'citizen' within the meaning of the privileges and immunities clause."); <u>Grand National Bank v. Village of Round Lake Beach</u>, 1997 WL 12796 at *5 n.8 (N.D.Ill. 1997); <u>Sawmill Products, Inc. v. Town of Cicero, Cook County, Illinois</u>, 477 F. Supp. 636, 638 (N.D.Ill. 1979). Thus, while corporations can bring claims under §§ 1981 and 1983, they cannot bring claims under § 1982.

Decisions by the Fifth and Sixth Circuit Courts of Appeals further support the finding that corporations do not have statutory standing to bring § 1982 claims. *See* <u>U.S. v. Greer</u>, 939 F.2d 1076 (5th Cir. 1991); <u>U.S. v. Brown</u>, 49 F.3d 1162 (6th Cir. 1995). In <u>Greer</u>, white supremacists vandalized a Jewish temple and community center. 939 F.2d at 1082-83. They were convicted of conspiracy to deprive Jewish citizens of their rights under § 1982. *Id.* at 1081. Defendants argued that they could not have conspired to deprive citizens of their rights because the property was owned by non-profit corporations, which "are not citizens within the clause of the Constitution declaring that '[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States.'" *Id.* at 1091. While the court recognized that defendants' argument had merit, it found that "the government is able to obviate these concerns by demonstrating successfully that the phrase 'to hold' property under the statute can also mean 'to use' property." *Id.* Understood to protect the right to use property, § 1982 provided temple members and guests, who clearly were citizens, with claims.

<u>Brown</u> involved similar facts and a similar outcome. 49 F.3d at 1164. The defendant was convicted of conspiracy to deprive Jewish citizens of their § 1982 rights because he aided a fellow white supremacist, who had fired shots into an empty synagogue, in evading the authorities. *Id.* at 1165. As in <u>Greer</u>, the defendant argued that since the synagogue was not

held by a citizen but by a corporation, there could be no violation of § 1982. *Id.* The Sixth Circuit found that the synagogue members' § 1982 rights were implicated because the statute protects a non-owners right to use property. *Id.* at 1066. If corporations could bring claims under § 1982, the courts in <u>Greer</u> and <u>Brown</u> would not have been required to determine whether the rights of synagogues members were protected by § 1982; there would have been a clear violation of § 1982 based on the corporate-owners' rights. However, given that corporations are not citizens whose rights trigger a § 1982 violation, the courts analyzed whether § 1982 protection extended to citizens who did not own, but used the synagogues. As Comtel or S&C is the owner of the property at issue in this case, and use of the property is not implicated as in <u>Greer</u> or <u>Brown</u>, plaintiffs do not have standing to bring this claim.

In an attempt to defend their claim, plaintiffs rely on various housing discrimination cases, such as <u>City of Evanston v. Baird & Warner, Inc.</u>, 1990 WL 186575 at *5 (N.D.Ill. 1990). Given that discriminatory housing practices often lead to claims for violation of both the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*, and § 1982, the two statutes are, at times, conflated, instead of being dealt with separately. Corporations can clearly bring claims under the Fair Housing Act as it applies to "persons", which the Act specifically notes "includes one or more individuals, corporations, partnerships, associations . . . ." 42 U.S.C. § 3602(d). In <u>Gladstone Realtors v. Village of Bellwood</u>, 441 U.S. 91 (1979), the Supreme Court allowed a village to bring a claim under the Fair Housing Act based on defendant's alleged racial steering, which was affecting its racial balance and diminishing its tax base. Subsequent decisions have cited <u>Gladstone Realtors</u> for the proposition that towns, non-profit organizations, and corporations can also bring claims under § 1982. *See* <u>City of Evanston</u>, 1990 WL 186575 at *5; <u>City of Chicago Heights v. Arquilla-DeHaan Realtors, Inc.</u>, 1980 U.S. Dist. LEXIS 11545 at *12

(N.D.Ill. 1980); <u>Village of Bellwood v. Dwivedi</u>, 895 F.2d 1521, 1525 (7th Cir. 1990). However, when granting corporate entities standing to bring § 1982 claims, none of these courts has acknowledged, much less discussed, the distinction between the Fair Housing Act's protection of "persons" and § 1982's protection of "citizens." Often the courts are more focused on whether these plaintiffs have suffered damages that grant them standing. Even in <u>Baird v. Warner, Inc.</u>, where the court recognized that plaintiffs do not have the same latitude under § 1982 as under the Fair Housing Act, it did not address the significant difference between "persons" and "citizens." 1990 WL 186575 at *4. As explained above, we do note the difference and are compelled to enforce § 1982 as written – limiting its protection to "citizens," a category that does not include the private corporations, Comtel and S&C. Count II is dismissed.

<u>42 U.S.C. § 1985(3) (Count III)</u>

Defendants also move to dismiss plaintiffs' § 1985(3) claim for conspiracy. 42 U.S.C. § 1985(3) states, in pertinent part:

> "If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators."

To state a claim under this section a plaintiff must allege "(1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of the equal protection of the laws, (3) an act in furtherance of the conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens." <u>Brokaw v. Mercer County</u>, 235 F.3d 1000,

1024 (7th Cir. 2000). PHS contends that plaintiffs cannot satisfy the second required element because in order to show a private conspiracy to deprive plaintiffs of equal protection of the laws they must establish not only class-based invidious discrimination, Griffin v. Breckenridge, 403 U.S. 88, 102 (1971), but also a federal right protected against private interference, Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 278 (1993).

In Bray, the Supreme Court rejected the plaintiffs' § 1985(3) claim against private citizens for conspiring to interfere with the federal right to an abortion. 506 U.S. at 278. The Court explained that § 1985(3) only applies "to such conspiracies as are 'aimed at interfering with rights . . . protected against private, as well as official, encroachment.'" Id. (quoting United Brotherhood of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott, 463 U.S. 825, 833 (1983)). The Court noted that it had only recognized two such rights: the right to be free from involuntary servitude and the right of interstate travel. Bray, 506 U.S. at 278. Following the decision in Bray, the Seventh Circuit acknowledged § 1985(3)'s limited application to private conspiracies. Brokaw, 235 F.3d at 1024 n.20 ("While Section 1985(3) extends to private conspiracies, for a private conspiracy to be actionable it must affect the 'Thirteenth Amendment right to be free from involuntary servitude, and, in the same Thirteenth Amendment context, the right of interstate travel.'").

Defendants' alleged interference with plaintiffs' right to contract, the basis for their § 1981 claim, is not a right protected against private and official encroachment. In arguing for a broader application of § 1985(3), plaintiffs rely on cases that pre-date Bray and Brokaw, and ignore authority in the First, Sixth, and Tenth Circuits limiting § 1985(3) claims to private conspiracies concerning interstate travel and involuntary servitude. See Libertad v. Welch, 53 F.3d 428, 447 n. 15 (1st Cir. 1995); Sanders v. Prentice-Hall Corp., 178 F.3d 1296 (Table),

1999 WL 115517 at *2 (6th Cir. 1999); <u>Tilton v. Richardson</u>, 6 F.3d 683, 686 (10th Cir. 1993); *see also* <u>Brown v. Philip Morris Inc.</u>, 250 F.3d 789 (3d Cir. 2001)("The great weight of precedential authority, however, supports the traditional limitation of § 1985(3) to questions of interstate travel and involuntary servitude and does not suggest that §§ 1981 or 1982 claims in general may form the basis of a § 1985(3) action.").

In a supplemental memorandum, plaintiffs belatedly argue that the alleged conspiracy was not a purely private conspiracy – subject to action only for the infringement of rights protected against both private and public encroachment – but actually involved the state because PHS sought to influence the Plainfield School District. Some courts have indicated that a § 1985(3) claim may be brought against private individuals for the infringement of state-protected rights when they conspire to influence public actors. *See* <u>Libertad</u>, 53 F.3d at 449-450; <u>Stevens v. Tillman</u>, 855 F.2d 394, 404 (7th Cir. 1988)[2]. In <u>Libertad</u>, the court distinguished between a § 1985(3) deprivation claim, where private conspirators seek to deprive the plaintiffs of a constitutional right, and a § 1985(3) hindrance claim, where they conspire "for the purpose of arresting or impeding the State's power to protect or secure equal protection of the laws to a group of citizens . . . supplanting the State's conduct with their own." 53 F.3d at 450. In their complaint, plaintiffs clearly state that defendants' conspiracy was intended to deprive them of their rights. The court in <u>Libertad</u>, like other courts cited above, found that § 1985(3) deprivation claims against private conspirators are limited to rights guaranteed against both private and official encroachment. *Id.* Plaintiff's allegation that PHS induced the Plainfield

---

[2] The Seventh Circuit doubted this possible application of § 1985(3), even as it proposed it – "We very much doubt that § 1985(3) properly may be used to penalize racially-motivated political campaigns, any more than the antitrust laws may be used to penalize deceitful campaigns to obtain protection from competition." <u>Tillman</u>, 855 F.2d at 404. Furthermore, as pointed out above, <u>Tillman</u>'s discussion of 1985 precedes the Supreme Court's assessment in <u>Bray</u>.

School District to make unjustified payments does not change the purpose of defendants' conspiracy from the deprivation of plaintiffs' rights to the hindrance of the State's exercise of authority.

In <u>Tillman</u>, the Seventh Circuit did not discuss the distinction between deprivation and hindrance claims, but it did make clear that a viable § 1985(3) claim involving a private conspiracy to influence state action requires injury at the state's hands. <u>Tillman</u>, 855 F.2d at 404-05. Defendants may have induced the school district to make unjustified payments as part of its conspiracy, but the district was not induced to cause any harm to plaintiffs. Thus, even if a plaintiff has a § 1985(3) action against private conspirators for violation of federal rights other than interstate travel and freedom from involuntary servitude when the purpose of the conspiracy is to influence or usurp state action, plaintiffs do not allege such a conspiracy in this case. Count III is dismissed.

<u>Fraud (Count IV)</u>

PHS next moves to dismiss plaintiffs' fraud claim. To state a claim for fraud plaintiffs must allege (1) a false statement of material fact (2) known or believed to be false by the defendant making it; (3) intent to induce the plaintiffs to act; (4) action by plaintiffs relying on the truth of the statement; and (5) damage to the plaintiff as a result of their reliance. <u>Soules v. General Motors Corp.</u>, 79 Ill.2d 282, 286, 402 N.E.2d 599, 601 (Ill. 1980); <u>Kapelanski v. Johnson</u>, 390 F.3d 525, 530 (7th Cir. 2004). Plaintiffs provide two bases for their fraud claim: PHS' false statements that it had received lower bids on the electrical work, and various false statements regarding plaintiffs' inadequate performance, lack of appropriate materials and manpower, and assorted work site deficiencies. PHS argues that plaintiffs could not have justifiably relied on either set of alleged misrepresentations, and thus the claim must be

dismissed. While we agree that plaintiffs do not state a claim based on the alleged misrepresentations of their work, plaintiffs do state a claim for the alleged misrepresentations of the work bids.

For plaintiffs' fraud claim to succeed, their reliance on PHS' misrepresentations must be justifiable. Vigortone AG Products, Inc. v. PM AG Products, Inc., 316 F.3d 641, 645 (7th Cir. 2002)(citing Charles Hester Enterprises, Inc. v. Illinois Founders Insurance Co., 114 Ill.2d 278, 288, 499 N.E.2d 1319, 1323 (1986)). Reliance is only justifiable where plaintiffs "do not have equal knowledge or means of obtaining knowledge of the facts which are allegedly misrepresented." Chicago Export Packing Co. v. Teledyne Industries, Inc., 207 Ill.App.3d 659, 663, 566 N.E.2d 326, 329 (1st Dist. 1990). The Seventh Circuit has explained that a plaintiff's reliance is unjustifiable, if it is reckless – "ignoring a manifest danger." Vigortone AG Products, Inc., 316 F.3d at 645 (quoting AMPAT/Midwest, Inc. v. Illinois Tool Works Inc., 896 F.2d 1035, 1042 (7th Cir. 1990)).

Whether plaintiffs' reliance was justified is generally a question of fact, which cannot be resolved on a motion to dismiss. See Duhl v. Nash Realty Inc., 102 Ill.App.3d 483, 491, 429 N.E.2d 1267, 1274 (1st Dist. 1981); Sabratek Liquidating LLC v. KPMG LLP, 2002 WL 774185 at *3 (N.D.Ill. 2002). Such is the case with plaintiffs' allegations that they reduced their subcontracting bids relying on PHS' allegedly false representations that it had received lower bids. Citing Premier Electrical Construction Co. v. Morse/Diesel, Inc., 257 Ill.App.3d 445, 628 N.E.2d 1090 (1st Dist. 1993), PHS argues that plaintiffs could not have justifiably relied on misrepresentations regarding other bids because they could have investigated the claim before lowering their bids. In Premier Electrical Construction Co., the court affirmed summary judgment for the defendants, finding that the circumstances could not support the conclusion

that the plaintiff justifiably relied on the defendants' representation of lower bids. *Id.* at 460. The court highlighted the plaintiff's sophistication in the business, the value of the contract, the nature of the business, and the passage of time from when plaintiff received copies of the alleged bids until when it entered into a subcontract. *Id.* While this determination may be appropriate on summary judgment, it is not on a motion to dismiss. We cannot find that given the alleged circumstances plaintiff could not have justifiably relied on PHS' representations concerning lower bids.

While it is not clear whether plaintiffs would have had equal means to obtain knowledge of the electrical bids received, it is clear that they had equal knowledge regarding their own performance on the subcontract. Plaintiffs' alleged reliance on PHS' statements concerning deficient work is reckless, as it ignores their own first-hand knowledge of their materials, manpower, and performance. As defendants point out, the notion that these alleged misrepresentations induced plaintiffs to believe that they were assured compensation, rather than causing them worry that they would not be compensated, is perplexing. To the extent plaintiffs are attempting to state a claim for fraud based on misrepresentations not alleged in the complaint, the claim fails – their response to a motion to dismiss does not amend the complaint. *See* Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 (7th Cir. 1984). Count IV survives PHS' motion to dismiss to the extent it alleges a claim concerning misrepresentations of lower contracting bids.

Illinois Uniform Deceptive Trade Practices Act (Count V and Count VII)

Plaintiffs also bring separate claims under § 2 of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* (UDTPA), against both PHS and Nuline. The UDTPA provides, in part: "A person engages in a deceptive trade practice when, in the course of his

or her business, vocation or occupation, the person: . . . (8) disparages the goods, services, or business of another by false or misleading representation of fact." 815 ILCS 510/2. In Count V against PHS, plaintiffs state numerous allegedly damaging activities, but the relevant allegation is that PHS falsely accused Comtel of failing to adequately perform under its contract – an accusation it shared with plaintiffs' bonding company and with the school district. In Count VII against Nuline, plaintiffs allege that defendant violated the statute by including "false statements of fact" in its report to PHS and "falsely claiming ComTel's work was nonconforming."

The UDPTA does not provide a cause of action for damages – its only remedy is injunctive relief. Greenberg v. United Airlines, 206 Ill.App.3d 40, 46, 563 N.E.2d 1031, 1036 (1st Dist. 1990); Greisz v. Household Bank (Illinois), 8 F.Supp.2d 1031, 1044 (N.D.Ill. 1998). Defendants argue that plaintiffs fail to allege a basis for injunctive relief. We agree. The complaint asserts that defendants made disparaging misrepresentations regarding plaintiffs' work in the past, but provides no indication that the misrepresentations have continued or will occur in the future. Absent a threat of future disparaging misrepresentations, there is no need for injunctive relief and, therefore, no claim under the UDTPA. Greenberg, 206 Ill.App.3d at 46-47, 563 N.E.2d at 1037; Smith v. Prime Cable of Chicago, 276 Ill.App.3d 843, 859-60, 658 N.E.2d 1325, 1337 (1st Dist. 1995)("Since, as discussed above, the Plaintiffs could not show a likelihood of future damage from the acts of the Defendants, their cause of action under the Uniform Deceptive Trade Practices Act must fail."); American Pet Motels, Inc. v. Chicago Veterinary Medical Association, 106 Ill.App.3d 626, 633, 435 N.E.2d 1297, 1303 (1st Dist. 1982)(abrogated on other grounds in Kuwik v. Starmark Star Marketing and Administration, Inc., 156 Ill.2d 16, 25, 619 N.E.2d 129, 133 (Ill. 1993)). Furthermore, plaintiffs' requested

injunction against PHS – to prohibit PHS from maintaining any claim under the bonds – does not seek to remedy a violation of the UDTPA. We do not reach Nuline's argument that plaintiffs' claim does not fall under the purpose of the UDTPA, which is to address misleading trade identification and false or deceptive advertising. *See* <u>Menasha Corp. v. News America Marketing In-Store, Inc.</u>, 238 F.Supp.2d 1024, 1035 (N.D.Ill. 2003). Counts V and VII are dismissed.

<u>Tortious Interference with a Contract (Count VIII)</u>

Plaintiffs bring Count VIII against Nuline. Although it is entitled "Tortious Interference With Business Relationship," plaintiffs actually plead, and parties argue, the separate tort of tortious interference with a contract. To state a cause of action for tortious interference with a contract, plaintiff must allege "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." <u>Belden Corp. v. InterNorth, Inc.</u>, 90 Ill.App.3d 547, 551, 413 N.E.2d 98, 101 (1st Dist. 1980), <u>HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.</u>, 131 Ill.2d 145, 154-55, 545 N.E.2d 672, 676 (Ill. 1989). Plaintiffs allege two valid contracts with PHS; Nuline's awareness of these contracts; Nuline's inducement of PHS to breach the contracts by making false and disparaging statements regarding plaintiffs' work and positioning itself to smoothly assume plaintiffs' work under the subcontract; PHS' subsequent breach; and damage to plaintiffs as a result.

Nuline argues that plaintiffs' claim fails because there is no allegation that its alleged inducement caused PHS to breach its contract. Indeed, the complaint's own allegations

foreclose the possibility that PHS breached its contract due to Nuline's inducement. Plaintiffs allege that "[o]n information and belief, PHS contacted NuLine, a company, which PHS had an ongoing business relationship with, and informed NuLine of its scheme to terminate ComTel and to hire NuLine to complete ComTel's work. NuLine fully agreed to participate." Thus, according to plaintiffs' own assertions Nuline did not induce PHS to breach, but rather PHS made a decision to breach and then requested Nuline's assistance in the "scheme." Count VIII is dismissed.

## Civil Conspiracy (Count IX)

Defendants maintain that plaintiffs' civil conspiracy claim must also be dismissed. The elements of a civil conspiracy claim in Illinois are "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties; and (4) the overt act was done pursuant to and in furtherance of the common scheme." Vance v. Chandler, 231 Ill.App.3d 747, 750, 597 N.E. 2d 233, 236 (3d Dist. 1992)(citing Wolf v. Liberis, 153 Ill.App.3d 488, 496, 505 N.E.2d 1202, 1208 (1st Dist. 1987)). As alluded to above, plaintiffs allege that PHS and Nuline concocted a scheme by which Nuline would replace Comtel as the electrical contractor on the Plainfield school projects. Under defendants' alleged agreement, Nuline made false representations regarding Comtel's work, thereby making it easier for PHS to terminate Comtel and withhold its payment.

Defendants argue that this claim fails because civil conspiracy requires an unlawful overt act and the only overt act that plaintiffs allege is breach of contract, which is not tortious or unlawful. See Eichmann v. National Hospital and Health Care Services, Inc., 308 Ill.App.3d 337, 342 , 719 N.E.2d 1141, 1145 (1st Dist. 1999). Plaintiffs counter that Nuline did commit an

unlawful act – tortious interference with a contract – and that while PHS cannot generally be held liable for breach of its own contract, it can be held liable along with Nuline for conspiring to breach its contract. *See* <u>Blivas & Page, Inc. v. Klein</u>, 5 Ill.App.3d 280, 286, 282 N.E.2d 210, 214 (2d Dist. 1972); <u>J.F. Equipment, Inc. v. Owatonna Manufacturing Co., Inc.</u>, 143 Ill.App.3d 208, 217, 494 N.E.2d 516, 522 (2d Dist. 1986); <u>Walsh v. Franslow</u>, 123 Ill.App.3d 417, 462 N.E.2d 965 (1st Dist. 1984); <u>Denari v. Genesis Insurance Co.</u>, 2002 WL 255505 at *1 (N.D.Ill. 2002); <u>Miyano Machinery USA, Inc. v. Zonar, L & D</u>, 1994 WL 233649 at *6 (N.D.Ill. 1994). Of course, the problem with this argument is that it is contingent on plaintiffs' claim of tortious interference with a contract, which is not supported by the complaint. As plaintiffs have failed to plead that PHS or Nuline participated in an unlawful overt act, Count IX is dismissed.

<u>Conversion (Count X)</u>

Finally, Nuline moves to dismiss plaintiffs' conversion claim. Conversion is an "unauthorized act which deprives a man of his property permanently or for an indefinite time." <u>Union Stock-Yard & Transit Co. v. Mallory, Son & Zimmerman Co.</u>, 157 Ill. 554, 563, 41 N.E. 888, 890 (Ill. 1895). The elements of conversion are "(1) a right in the property, (2) a right to immediate possession, (3) wrongful control by the defendant, and (4) a demand for possession." <u>IOS Capital, Inc. v. Phoenix Printing, Inc.</u>, 348 Ill.App.3d 366, 370, 808 N.E.2d 606, 610 (4th Dist. 2004)(citing <u>Cirrincione v. Johnson</u>, 184 Ill.2d 109, 114, 703 N.E.2d 67, 70 (2d Dist. 1998)). Plaintiffs allege that at the time they were terminated on the Plainfield projects, they had a considerable amount of equipment, materials and fixtures at the work sites. Some of these materials had been installed and some had not. The complaint states that plaintiffs had an immediate right to possession of the materials. Yet, they were allegedly

deprived of this right when Nuline destroyed some of these materials and refused to return others despite plaintiffs' requests. Nuline disputes that plaintiffs had a right to immediate possession of materials that were already incorporated into the project. However, this argument goes to the merits of plaintiffs' claims, not to the sufficiency of their pleadings. Furthermore, plaintiffs' allegations assert that Nuline converted materials that were not incorporated into the project as well. Plaintiff's allegations are sufficient to plead a conversion claim. *See* Bruss Co. v. K & S Brokerage, Inc., 1992 WL 38396 (N.D.Ill. 1992)(rejecting argument that party failed to plead conversion claim because it did not allege facts).

## Plaintiffs' and Hartford's Motions to Dismiss or Stay

In response to plaintiffs' complaint, PHS filed a First Amended Counterclaim and Third Party Complaint (hereinafter counterclaim) against Comtel and S&C, and against Hartford Fire Insurance Company (Hartford), a non-party to the original action. In its counterclaim, PHS asserts that the court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims against plaintiffs and has diversity jurisdiction pursuant to 28 U.S.C. § 1332 over the claims against Hartford. Plaintiffs filed a motion to stay or dismiss the counterclaim, as did Hartford. Plaintiffs argue that dismissal or a stay of PHS' counterclaim is appropriate under the abstention doctrine developed in Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976). Hartford maintains that the court does not have jurisdiction over the claims against it because the parties are not diverse and supplemental jurisdiction is not appropriate. Hartford further asserts that, even if PHS has jurisdiction, plaintiffs rightly assert that the court should stay defendant's action under the Colorado River doctrine.

We will first address Hartford's argument regarding jurisdiction. PHS' counterclaim

alleges twenty-four counts, sixteen of which it brings against Hartford, as well as Comtel and S&C. PHS asserts that the court has diversity jurisdiction over the claims against Hartford because the two parties are citizens of different states and PHS' claims seek in excess of $75,000. Hartford contends that diversity jurisdiction requires complete diversity between plaintiff and defendants, and that counter-plaintiff, PHS, is not completely diverse from the counter-defendants, as both PHS and S&C were incorporated in Illinois. While recognizing that it does not have diversity of citizenship with counter-defendants, PHS attempts to treat its allegations against Hartford separately from those against Comtel and S&C, as reflected in the title of its filing, "First Amended Counterclaim and Third Party Complaint." In fact, PHS has not plead a separate third-party action against Hartford, but rather has brought a counterclaim against plaintiffs to which it has joined the non-party, Hartford.

Federal Rule of Civil Procedure 14 governs third-party practice. It allows a defendant to bring a complaint against a third party "who is or may be liable to the third-party plaintiff for all or part of the plaintiff's claim against the third-party plaintiff." Fed.R.Civ.P. 14; Nuveen Investments v. Hogan, 2001 WL 881363 at *7 (N.D.Ill. 2001); Forum Insurance Co. v. Ranger Insurance Co., 711 F.Supp. 909, 915 (N.D.Ill. 1989). PHS does not allege that Hartford may be liable in whole or in part for PHS' potential liability to plaintiffs. Rather, PHS claims that as plaintiffs' surety under performance and payment bonds, Hartford is liable to PHS for plaintiffs' alleged breaches of contract. Thus, Hartford's liability does not stem from PHS' potential liability to plaintiffs, but from plaintiffs' potential liability to PHS. Admittedly, PHS' claims against Hartford (and Comtel and S&C, for that matter), and plaintiffs' claims against PHS, arise from common core facts regarding plaintiffs' electrical work on the Plainfield school projects. However, that is not a proper basis for a third-party

action. *See* <u>Nuveen</u>, 2001 WL 881363 at \*7; <u>Forum Insurance Co.</u>, 711 F.Supp. at 915 ("The fact that the third-party claim arose out of the same transaction or set of facts is irrelevant, since impleader cannot be used 'as a way of combining all controversies having a common relationship.'").

Nonetheless, the Federal Rules of Civil Procedure provide another avenue for PHS' claims against Hartford. Rule 13, governing counterclaims, allows for non-parties to the original action to be made parties to a counterclaim in accordance with the provisions of Rules 19 and 20. Rule 13(h); WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 1446 (2d ed. 1990) ("When defendant wishes to assert a claim against both a codefendant and a third person, the correct procedure is to file a cross-claim and move under Rule 13(h) to bring the third person as an additional party to the cross-claim. A similar combination of a counterclaim and a Rule 13(h) motion is appropriate when the claim is against the original plaintiff and a nonparty."). As did the court in <u>Nuveen</u>, we will treat defendant's third-party complaint as an action to join Hartford to its counterclaim pursuant to Rules 13(h) and 20(a). Rule 20(a) allows permissive joinder of defendants if "any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action." When viewed in the proper procedural light, it is clear that the court's jurisdiction over claims against Hartford cannot rest on diversity because Hartford's interests are aligned with plaintiffs/counter-defendants, Comtel and S&C, who are not diverse with PHS.

Nonetheless, the court has jurisdiction over the claims against Hartford just as it has jurisdiction over the claims against Comtel and S&C. In 1990, Congress codified pendent jurisdiction and ancillary jurisdiction under the rubric "supplemental jurisdiction." 28

U.S.C.A. § 1367; <u>Baer v. First Options of Chicago, Inc.</u>, 72 F.3d 1294, 1298 (7th Cir. 1995).

Section 1367(a) provides that "in any civil action of which the district courts have original

jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that

are so related to claims in the action within such original jurisdiction that they form part of

the same case or controversy under Article III of the United States Constitution. Such

supplemental jurisdiction shall include claims that involve the joinder or intervention of

additional parties." Thus, under the statute, supplemental jurisdiction extends not only to

related counterclaims brought against plaintiffs but also related counterclaims brought against

non-parties.

Neither plaintiffs nor Hartford argues that PHS' claims are not so related to the

original action as to fail to trigger supplemental jurisdiction. Nonetheless, Hartford argues

that the court should opt not to exercise supplemental jurisdiction over the claims against it.

Under 28 U.S.C. § 1367(c), the court may decline to exercise supplemental jurisdiction over a

claim under four circumstances: the claim involves a novel or complex issue of state law; the

claim substantially predominates over the claims that provide the court original jurisdiction;

all claims over which the court had original jurisdiction have been dismissed; or exceptional

circumstances compel the court to decline jurisdiction. In discussing these factors the Supreme

Court has noted that "'a federal court should consider and weigh in each case, and at every

stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'" <u>City

of Chicago v. International College of Surgeons</u>, 522 U.S. 156, 173 (1997)(quoting <u>Carnegie-

Mellon University v. Cohill</u>, 484 U.S. 343, 350 (1988)).

Hartford argues that PHS' state law claims predominate over federal claims and that

exceptional circumstances exist warranting rejection of supplemental jurisdiction. In its reply

memorandum, Hartford asserts that "State law claims not only predominate in the Third Party Complaint, they are the only claims against Hartford." Hartford appears to misunderstand this issue. The question is not whether state law claims brought against Hartford predominate over the federal law claims brought against the company. Rather, the question is whether PHS' state law counterclaims predominate over plaintiffs' original claims. Viewing the claims against Hartford in isolation provides no insight into this issue. We reject Hartford's argument and find no other reason to believe that PHS' counterclaims predominate over plaintiffs' claims. Hartford equates the fourth factor for discretionary rejection of supplemental jurisdiction – exceptional circumstances – with the analysis for abstention under the <u>Colorado River</u> doctrine. Therefore, we will address that argument below.

Plaintiffs and Hartford contend that PHS' counterclaim should be dismissed or stayed under the <u>Colorado River</u> abstention doctrine. Though the pendency of an action in state court is generally not a bar to federal jurisdiction over an action concerning the same matter, under the <u>Colorado River</u> doctrine a federal court "may stay a suit in exceptional circumstances when there is a concurrent state proceeding and the stay would promote 'wise judicial administration.'" <u>Clark v. Lacy</u>, 376 F.3d 682, 685 (7th Cir. 2004)(quoting <u>Colorado River</u>, 424 U.S. at 818)). As the federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given to them," this doctrine provides "an extraordinary and narrow exception." <u>Colorado River</u>, 424 U.S. at 817-818, 813; *see* <u>Moses H. Cone Memorial Hospital v. Mercury Const. Corp.</u>, 460 U.S. 1, 14-15 (1983).

Analysis under the <u>Colorado River</u> doctrine is a two-step process. First, the court must determine whether the concurrent state and federal suits are parallel. <u>AXA Corporate Solutions v. Underwriters Reinsurance Corp.</u>, 347 F.3d 272, 278 (7th Cir. 2003). Then, it must

consider ten different factors to determine whether there are exceptional circumstances justifying abstention. <u>LaDuke v. Burlington Northern Railroad Co.</u>, 879 F.2d 1556, 1559 (7th Cir. 1989).

Two actions are parallel when "'substantially the same parties are contemporaneously litigating substantially the same issues in another forum.'" <u>AXA Corporate Solutions</u>, 347 F.3d at 278 (quoting <u>Caminiti & Iatarola, Ltd. v. Behnke Warehousing Inc.</u>, 962 F.2d 698 (7th Cir. 1992)). The actions need not be identical nor symmetrical, but there must be a "substantial likelihood that the foreign [or state] litigation will dispose of all claims presented in the federal case." <u>AAR International, Inc. v. Nimelias Enterprises S.A.</u>, 250 F.3d 510, 518 (7th Cir. 2001)(*internal quotations and citation omitted*); <u>Eisenmann Corporation v. Tek-Mor, Inc.</u>, 2004 WL 547253 at *3 (N.D.Ill. 2004).

Plaintiffs and Hartford argue that the state and federal court actions are parallel because PHS' counterclaims contain the same counts against the same parties. PHS asserts that a proper analysis of whether suits are parallel requires the court to consider both actions as a whole, not just the counterclaims. While some courts have limited their analysis of whether actions are parallel to a review of only the counterclaims filed in the suits, *see e.g.*, <u>Global Poly Inc. v. Fred's Inc.</u>, 2004 WL 532844 at *2 (N.D.Ill. 2004), such analysis would be inappropriate in this case. Counterclaims are not separate suits. Therefore, in determining whether or not litigation in the state court action will likely dispose of all litigation in the federal court action, we cannot view the counterclaims in isolation. As Hartford points out, if the plaintiffs' wrongful termination and breach of contract claims are unsuccessful in their state court action, then their federal civil rights claim will undoubtedly fail. However, if they are successful, the state court action will not resolve the federal action. In <u>Eisenmann Corp.</u>,

the court found that two actions were not parallel even though each suit concerned the parties' performance under the terms of a contract. 2004 WL 547253 at *4. Because the federal action contained claims independent of the state action, the court could not find that litigation in a foreign court would resolve all claims in the federal action. *Id.* Since "any doubt regarding the parallel nature of the [state] suit should be resolved in favor of exercising jurisdiction," the court found that the suits were not parallel. *Id.* Likewise, we find that the two actions at issue in this case are not parallel.

Even if the state and federal suits were parallel, and we only applied the <u>Colorado River</u> analysis to PHS' counterclaims, a stay[3] would not be appropriate. The Seventh Circuit has enumerated ten factors for courts to consider when considering whether exceptional circumstances exist to stay a parallel suit: "1) whether the state has assumed jurisdiction over property; 2) the inconvenience of the federal forum; 3) the desirability of avoiding piecemeal litigation; 4) the order in which jurisdiction was obtained by the concurrent forums; 5) the source of governing law, state or federal; 6) the adequacy of state-court action to protect the federal plaintiff's rights; 7) the relative progress of state and federal proceedings; 8) the presence or absence of concurrent jurisdiction; 9) the availability of removal; and 10) the vexatious or contrived nature of the federal claim." <u>LaDuke</u>, 879 F.2d at 1559. A court should not reach a decision by mechanically applying these factors to the case at hand, but by weighing its obligation to exercise jurisdiction against the considerations for abstention. *See* <u>Clark</u>, 376 F.3d at 687("[T]here is no mechanical formula by which to determine when a stay is appropriate.")(*citations omitted*); <u>AXA Corporate Solutions</u>, 347 F.3d at 278 ("[W]e have

---

[3] The Seventh Circuit has made clear that a stay, not dismissal, is the appropriate action when a court defers to a parallel state court proceeding under the <u>Colorado River</u> abstention doctrine. <u>LaDuke</u>, 879 F.2d at 1561-62.

recognized a general presumption against abstention.").

The fourth, fifth and seventh factors weigh in favor of abstention for PHS' counterclaims. The state court counterclaim was filed almost two years before the counterclaim in federal court, and there has been more progress in the state court action. PHS' first amended counterclaim in the federal court corresponded with its fifth amended counterclaim in the state court. Furthermore, the fact that all of plaintiffs' counterclaims are state law claims supports abstention.

Hartford argues that the first factor also weighs in favor of abstention because plaintiffs have filed an *in rem* mechanic's lien action in state court resulting in that court's jurisdiction over property. However, as PHS notes, none of the claims in federal court concerns this lien. Nonetheless, Hartford maintains that PHS' counterclaim may force plaintiffs to file a compulsory counterclaim making the lien an issue. Recognizing the possibility that the mechanics lien may become an issue in the event of a compulsory counterclaim, we find that the circumstances still do not warrant abdicating our obligation to exercise jurisdiction.

The remaining factors are either neutral or weigh against abstention. The second factor concerning the convenience of the forum is neutral, given that both the federal and state forums are in downtown Chicago. The third factor, however, weighs strongly against abstention. In Colorado River, the third factor – danger of piecemeal litigation – was the "paramount" consideration. Moses H. Cone Memorial Hospital, 460 U.S. at 19 (1983). Abstaining from hearing PHS' counterclaims would not avoid piecemeal litigation, for the actions brought by plaintiffs would still proceed in both courts. It would be especially inequitable to stay defendant's counterclaim in light of this consideration, as it was plaintiffs who created the danger of piecemeal litigation by filing suit in state court and then filing

additional federal and state law claims in federal court. *See* <u>Ting v. Chicago Mercantile Exchange</u>, 03 C 3927 (N.D.Ill. March 9, 2004); <u>Shadwick v. Butler National Corp.</u>, 950 F.Supp. 302, 304-305 (D.Kan. 1996); <u>Karakas v. McKeown</u>, 783 F.Supp. 1028, 1032 (E.D. Mich. 1992)(finding that when plaintiff elected to sue in federal court instead of state court, where there were already related pending claims, he opened the door to counterclaims and thus "brought this curse upon himself and cannot complain without coming to terms with the problem he has created.").

The sixth factor concerns the adequacy of the state courts to protect the federal plaintiffs' rights. While PHS applies this to plaintiffs, Comtel and S&C, plaintiffs and Hartford apply it to counter-plaintiff, PHS. This factor relates to the previous factor, for it was plaintiffs who chose to bring this action to the federal courts, creating the opportunity for PHS to file its counterclaims in federal court. Even though the state court could adequately adjudicate PHS' counterclaims, it does not have jurisdiction over plaintiffs' federal action since they chose a federal forum.

The eighth and ninth factors are also neutral given plaintiffs choices in pursuing this litigation. The presence of concurrent jurisdiction would generally support a finding for abstention in the federal action. Here there is concurrent jurisdiction for PHS' state law counterclaims. However, the state court also would have had jurisdiction over plaintiffs' federal claims. <u>Nevada v. Hicks</u>, 533 U.S. 353, 367 (2001)("[S]tate courts of 'general jurisdiction' can adjudicate cases invoking federal statutes, such as § 1983, absent congressional specification to the contrary."). Yet, plaintiffs chose to litigate these claims in the federal courts. In such circumstances, we decline to find that this factor weighs in favor of staying PHS' counterclaims. The state court action is not removable to federal court,

though it would have been had the federal claims been plead in the state court action.

Finally, the tenth factor is whether the federal claim is contrived or vexatious. As PHS' counterclaims contain no federal claims, this factor would be inapplicable under the plaintiffs' approach, which only considers the counterclaims. Whether or not plaintiffs' federal claims were contrived or vexatious – they were not – is seemingly irrelevant to limited questions of whether or not to stay PHS' counterclaims.

In sum, the factors favoring abstention do not outweigh the court's obligation to exercise the jurisdiction it has. Furthermore, given that piecemeal litigation will not be avoided by staying PHS' counterclaims, and that the concurrent proceedings over the counterclaims are the result of plaintiffs' litigation choices, abstention is inappropriate.

We recognize that this result creates the risk of duplicative litigation. That can be obviated to some extent by recognizing prior discovery in state court as equally applicable to this case and by ordering that all discovery hereafter in this case shall be so initiated that it is also applicable in the state case, and we so order.

## CONCLUSION

For the foregoing reasons, plaintiff Mallar Solai is dismissed from the suit for lack of standing; Counts II, III, V, VII, VIII and IX of plaintiff's complaint are dismissed; Comtel's and S&C's, and Hartford's motions to dismiss or stay PHS' counterclaim are denied.

_Jamas B. Moran_
**JAMES B. MORAN**
Senior Judge, U. S. District Court

_Feb. 22_, 2005.